# Edelson v. Bernstein et al.

*David Berger* and *Manuel Fleisher*, for plaintiff.

*Sidney L. Wickenhaver, C. Brewster Rhoads, Montgomery, McCracken, Walker & Rhoads* and *Nathan L. Edelstein*, for defendants.

BOK, P. J., June 16, 1954.—This is a complaint in equity whereby plaintiff ask an accounting of profits resulting from a real estate venture entered into by himself and defendants. Despite a partnership agreement providing for a percentage division of profits and losses among the parties, plaintiff claims the entire fund because of defendants' fraud.

Defendants, denying fraud, filed responsive answers.

A hearing was held on June 18 and 19, 1953. After negotiations, the property in question was sold and the fund is now presented to me for distribution according to requests for findings and conclusions filed on April 26, 1954, at which time argument was made thereon.

### Findings of Facts

1. Defendant Samuel Bernstein is a Philadelphia real estate broker, president of Bernstein & Bernstein Realty Corporation, a corporation wholly owned by defendant Bernstein and members of his immediate

family, and acted throughout the negotiations and agreements with plaintiff and Daniel G. Smith, pertinent to this case, as the duly authorized agent of Hedbern Company, a family partnership.

2. It was Samuel Bernstein's business judgment in January 1951 that the rental value of premises located at Twenty-third and Carpenter Streets greatly exceeded the rental then provided in the existing lease of General Motors Corporation of $17,000 per annum, that such property could be purchased for about $160,000, and that a renewal of the lease could probably be negotiated with the lessee by about September 1952 for a period of about 10 years at an annual rental of about $24,000.

3. At a meeting among plaintiff, defendant Smith and defendant Bernstein on January 22, 1951, defendant Bernstein disclosed to plaintiff and defendant Smith the results of his preliminary investigation of the premises and his opinion with respect to the investment possibilities in the premises.

4. The statements of defendant Bernstein with respect to the prospects for negotiation of renewal lease with the tenant constituted a statement of his opinion and business judgment, and were so understood by plaintiff, not as a representation of fact.

5. Defendant Bernstein informed plaintiff prior to the execution of the joint agreement of the parties dated March 6, 1951, and prior to the payment of $10,000 furnished by plaintiff as down payment on the agreement of sale of February 5, 1951, that it would be necessary for a financially responsible individual to execute a collateral bond in the amount of the mortgage of $100,000.

6. On or before February 5, 1951, plaintiff agreed to sign a collateral bond in the sum of $100,000 and furnished the name of the Philadelphia National Bank

as a reference for his financial responsibility as obligor on such a bond.

7. On or about January 22, 1951, plaintiff, defendant Smith and defendant Bernstein orally agreed to the terms of their joint venture and the percentage of interests of each therein, as subsequently reduced to writing and included in their written agreement dated March 6, 1951.

8. No representation was made to plaintiff by defendant Bernstein, or any of the defendants, at any time, either directly or indirectly by nondisclosure of material facts, that it would not be necessary for plaintiff to sign a collateral bond.

9. Defendant Bernstein discovered, developed, negotiated and consummated the investment plan of the joint venture of the parties, managed the property through Bernstein & Bernstein Realty Corporation, collected and received the rentals, distributed to plaintiff and defendant Smith payments of interest on their investment, and negotiated renewal lease with General Motors Corporation for a term of five years at an annual rental of $30,000.

10. The 33 percent interest of Hedbern Company in the profits and losses of the joint venture as set forth in the agreement dated March 6, 1951, was agreed upon by the parties as the compensation for the services of defendant Bernstein in discovering, developing, negotiating and managing, and defendant Bernstein, Hedbern Company and Bernstein & Bernstein Realty Corporation have received no other compensation for these services.

11. Plaintiff and defendant Smith have received interest at the rate of 5 percent per annum on their cash investment in addition to their interests in the profits of the joint venture.

12. On or about March 6, 1951, plaintiff, defendant Smith and Hedbern Company, the latter representing

defendant Bernstein, reduced the substance of their joint agreement to a writing which was executed by the three parties.

13. An executed copy of the agreement of sale was delivered to Samuel Bernstein on or about February 17, 1951, after the mortgagee had approved Samuel Edelson as a responsible bondsman. Neither plaintiff nor Daniel G. Smith received a copy of the agreement and never requested a copy or the right to examine the same.

14. Samuel Bernstein informed plaintiff and Daniel G. Smith of the terms of the agreement to purchase the property after its receipt on or about February 17, 1951.

15. At settlement on March 6, 1951, defendant Bernstein exhibited to defendant Smith and to plaintiff his copy of the agreement of sale dated February 5, 1951.

16. Plaintiff executed the collateral bond a few days after March 6, 1951, on demand of mortgagee, the mortgagee having failed to present the bond for execution on March 6, 1951.

17. At the time of settlement the mortgagee requested that the mortgage run for 21 months instead of 24 months, as set forth in the agreement of sale, so that the expiration date of the mortgage would coincide with the 90-day notice required to terminate the lease for the premises. Plaintiff, Samuel Bernstein and Daniel G. Smith agreed to the change in the due date of the mortgage loan.

18. Plaintiff did not rely upon any assumption, representation or nondisclosure of the fact that he would not be required to execute a collateral bond, either at the time that he orally agreed to the terms of the joint venture, or at the time that he furnished $10,000 for down payment on the agreement of sale,

or at the time that he entered into the written agreement dated March 6, 1951.

19. Plaintiff suffered no loss upon the collateral bond, and the bond has now been retired.

20. Plaintiff took no substantial risk in signing the collateral bond.

21. Defendant Bernstein and defendant Smith made no secret or undisclosed agreement between themselves.

22. Early in 1953 the existing mortgage on the premises was renewed by the mortgagee and a collateral bond in connection therewith was executed by plaintiff, defendant Smith and defendant Bernstein.

23. On November 24, 1952, General Motors Corporation, lessee, and Bernstein & Bernstein Realty Corporation, agent for the lessors, executed a release renewal agreement for a five-year period from February 28, 1953, at an annual rental of $30,000.

24. The release renewal was highly profitable to all of the parties in the joint venture, including plaintiff.

25. The property was sold at public auction on February 23, 1954, by agreement of the parties, for the sum of $212,000. Settlement with the purchaser was held on April 1, 1954.

26. The cash investment of plaintiff in the sum of $50,611.96, together with interest at the rate of 5 percent per annum, has been repaid to plaintiff from the proceeds of the settlement.

27. The cash investment of defendant Smith in the sum of $10,000, together with interest at the rate of 5 percent per annum, has been repaid to defendant Smith.

28. The mortgage on the premises has been satisfied, the collateral bond executed by plaintiff in connection with the mortgage has been canceled, and the

agreement of the parties extending the terms of the mortgage has been canceled.

29. The balance of the proceeds of the settlement are held in escrow by David Berger, Esq., and Nathan L. Edelstein, Esq., pending the adjudication of this court.

30. Money received by Bernstein & Bernstein Realty Corporation as rental payments for the premises, less payments therefrom on account of expenses, interest on the mortgage and interest on the cash investments of the parties, is being held pending disposition of this court.

## Discussion

Between the date of the hearing and the filing of requests the property in question was sold. Bought for $157,500, it brought $212,000, a nice profit of $54,500. The fund has been distributed except for the profit, which is now held in escrow.

Plaintiff claims the entire profit on the ground that defendants fraudulently misled him and should have none of the fruits of victory, while he, the passive beneficiary of the fraud, should have them all.

The parties signed an agreement of partnership by which all three were to share in gains and losses in the proportion of 45 percent to plaintiff, 33 percent to defendant Bernstein, and 22 percent to defendant Smith. Plaintiff advanced $50,000 toward the purchase price, Smith $10,000, and Bernstein was to manage the property.

Plaintiff does not complain that defendants made a secret profit or misled him as to the price or condition of the property. He does not contend that they served two masters to the detriment of one. At most his complaint is that they somehow conspired together so as to change the risk he was to carry by altering some of the financial arrangements of the purchase.

His first charge is that defendants did not show him the agreement of sale, but he does not assert that he asked for it and was refused or put off. His conduct strikes me as essentially passive and he now seeks to blame the others for what he could have learned or foreseen if he had exerted himself promptly enough to find out. Thus, not having seen the agreement, he did not know that the seller was to provide the mortgage or that he might be asked, as title owner, to sign a collateral bond. When this was required, not by defendants but by the Bryn Mawr Trust Company, he testified that he "visualized" that he might lose his deposit if he did not sign the bond. In this he overlooked the provisions of the partnership agreement that defendants were obliged to share his losses with him. The most defendants did was to tell him that if he did not sign the bond the deal would fall through. And in extending the mortgage, defendants joined plaintiff in obligating themselves to guarantee the principal and interest of the bond secured by it, which is some evidence of their integrity.

Plaintiff alleges fraud in the particular of the seller's two-year mortgage being reduced from 24 to 21 months. It is clear from the evidence that the Bryn Mawr Trust Company required this change in order to have the mortgage expire at the time when three months' notice would be given to terminate or renew the lease. Defendants had nothing to do with this.

The lease raises the second major point of plaintiff's attack. Under the existing lease General Motors paid a total of $24,000 per year. The original aim was to renew the lease at this figure for 10 years. General Motors demurred, however, and after negotiations agreed to a five-year lease at $30,000 per year. Plaintiff feels defrauded because this was done without his knowledge. My feeling is that he could have found out as much as he cared to if he had wanted to. Aside

from this, far be it from me to say that defendants should or could have done better with as lively a bargainer as General Motors or that their final arrangement was not in the best interests of the deal. The whole intention of the investment appears to have been that it should be a quick and profitable turnover, about two years in duration. This notion being well within the five-year period of the lease, the parties got more income than they would have got during the run under a longer lease. If a longer lease at less money per year might have helped to refinance the property, plaintiff doesn't complain that the profits weren't bigger than they are or that a collateral bond in a slightly smaller sum would have been agreeable to him.

I see no fraud here. I have no doubt that a confidential relation exists between an investor and his advisor, but I see no breach of it or any overreaching here. The terms of such a deal are bound to fluctuate under negotiation, and I regard defendants' original statement of the terms as nothing more than their best judgment of how the property could be had. I also regard it as naive in plaintiff to expect the others to do all that was necessary without shouldering part of the pack himself. Far from being hurt, he has profited handsomely and his effort to gather all the profit to himself strikes me as egregious. It should be divided according to the partnership agreement.

*Conclusions of Law*

1. The record reveals no fraud.

2. The fund should be distributed according to the partnership agreement dated March 6, 1951.

3. The complaint should be dismissed.

*Decree Nisi*

And now, June 16, 1954, upon consideration of the foregoing case, it is ordered, adjudged, and decreed as follows:

1. The fund now held in escrow shall be divided between the parties in accordance with the agreement dated March 6, 1951.

2. The complaint is dismissed, costs to be paid by plaintiff.

### OPINION SUR EXCEPTIONS

BOK, P. J., February 18, 1955.—The argument presents no material that has not been considered and disposed of by the adjudication.

There is no quarrel with plaintiff's law as to confidential relationships, fair dealing, and full disclosure. It does not apply to the found facts before us, and we think that the findings are evidentially supported and correctly made. We agree that there was no fraud or overreaching.

Fraud must be established by clear and convincing evidence: Stafford v. Reed, Admr., 363 Pa. 405 (1950); Bayout v. Bayout, 373 Pa. 549 (1953).

The pattern of fraud, outlined in Neuman v. Corn Exchange National Bank and Trust Company, 356 Pa. 442 (1947), is: (1) A misrepresentation; (2) the fraudulent utterance of it; (3) the intention that the victim will be induced to act on it; (4) justifiable reliance on it, and (5) damage.

Damage flowing from the fraud is necessary: Doggett v. Feitig, 249 Pa. 461 (1915); Hardinge v. Kuntz et al., 278 Pa. 232 (1923); Curtis v. Buzard, 254 Pa. 61 (1916); Peters v. Stroudsburg Trust Co., 348 Pa. 451 (1944).

Defendants before us acquired no secret profit, took no title covertly, misled no one as to the price or condition of the property, and appropriated nothing to themselves. Plaintiff's point of attack is that they altered the risk that plaintiff assumed, but the chancellor chose to accept defendants' version of the transaction, and even plaintiff's coloration of it is little more than the whipsaw of negotiation and settlement

of a joint venture. No one but a prophet could foresee the result of the bargaining with General Motors, and if plaintiff is sensitive that he was not more promptly shown the agreement of sale and told about the need to sign a collateral bond, he had protection in the partnership agreement that losses would be shared.

The law being largely pragmatic, we should not be astute to discover fraud or even to slant the equities toward it when a transaction has been as magnificently successful as this one and has brought plaintiff a profit. The sale of the property has been completed, the collateral bond retired, the contributions of the parties repaid them with 5 percent interest added, and a handsome profit realized.

We do not say that fraud should not be found whenever a venture is profitable. In a proper case it might be just to move the entire profit into one pocket, but it should appear that the fraud was substantial and was established not equivocally but by clear and convincing evidence. The courts should be quick to look for fraud but not as quick to declare it.

Plaintiff's authorities to justify his having the whole profit reveal very different situations.

In Luther v. Luther, 242 Pa. 530 (1914)—see same case at 226 Pa. 114 for the facts—a son practiced such fraud upon his mother as to get for himself a deed to property which she had been struggling for years to redeem. He was compelled to restore it fully.

In Drob et al. v. Jaffe et al., 351 Pa. 297 (1945), there was no confidential relationship and no fraud.

In Hamberg v. Barsky et al., 355 Pa. 462 (1947), a barefaced and admitted fraud was perpetrated when the defendant took the property in his own name.

In Brooks et al. v. Conston et al., 356 Pa. 69 (1947), defendant bought a widow's busines for inadequate consideration and was required to rescind the sale and account for the profits while he had the property.

In McCully et ux., v. Flanagan et al., 99 Pa. Superior Ct. 566 (1930), defendant was guilty of fraud in taking title to property after exaggerating the purchase price and appropriating his partner's overpayment. He was ordered to disgorge completely.

The exceptions are dismissed.

*Final Decree*

And now, December 20, 1954, the exceptions are dismissed and the decree nisi is made final.